# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CLAUDELL EARL MARTIN,

          Plaintiff,

v.

JEANNE S. WOODFORD, et al.,

          Defendants.

_____/

CASE NO. 1:08-cv-00415-LJO-SKO PC

FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED

(Doc. 90)

OBJECTIONS DUE WITHIN 30 DAYS

        Plaintiff Claudell Earl Martin ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  On June 28, 2010, Defendants Fisher, Flory, Henry, McGuinness[1], Patel, and Thomas ("Defendants") filed a motion for summary judgment.  Defendants argue that they are entitled to judgment as a matter of law because there are no genuine issues of material fact.

## I.    **Background**

### A.    **Plaintiff's Claims**

        This action proceeds on Plaintiff's March 21, 2008 complaint.  (Doc. #1.)  Plaintiff claims that his Eighth Amendment rights were violated while he was incarcerated at Kern Valley State Prison ("KVSP") because prison officials acted with deliberate indifference toward Plaintiff's

///

---

[1]Defendant McGuinness has since been dismissed from this action.

serious medical needs and because prison officials retaliated against Plaintiff's exercise of his First Amendment rights.

Plaintiff alleges that he was transferred from Corcoran State Prison ("Corcoran") to KVSP on August 5, 2005. Plaintiff also alleges that he has a history of heart problems. Dr. McGuinness examined Plaintiff and prescribed treatment and medication. Plaintiff only received medication for a few days and filed a grievance when he was no longer receiving his medication. Plaintiff's grievance was granted, but Plaintiff only received some of his medications. Plaintiff resubmitted another grievance. Appeals Coordinator Gricewich determined that the grievance was duplicative and screened it out.

Approximately one year later on August 1, 2006, Plaintiff felt he was choking on his food. Officer Ortiz called the medical department and L. Garcia arrived and allegedly told Plaintiff that the medical department would not respond unless Plaintiff was blue in the face or passed out on the floor. Plaintiff then filed a grievance complaining about Garcia's unprofessional conduct. Plaintiff's grievance also complained about the denial of his heart medication. Defendant Patel Ismail reinstated the medication on October 11, 2006, but did nothing with respect to Plaintiff's complaints about Garcia. Plaintiff appealed the decision, which was denied at the second and third levels of appeal by A. Youssef and N. Grannis.

Plaintiff alleges that he was at risk of substantial harm because he was not receiving Plavix or nitroglycerine. Plaintiff alleges that Defendant Patel was in charge of prescribing Plaintiff's medications. Plaintiff did not receive any medication until September 5, 2005. Plaintiff claims that Patel was in possession of Plaintiff's "prescribed plan of treatment" but chose to "interrupt that treatment plan with his own plan of treatment." (Compl. 17, ECF No. 1.) Specifically, Plaintiff alleges that Patel deprived Plaintiff of Plavix and nitroglycerin for a year and failed "to even call Plaintiff in to check on him in that whole year." (Compl. 17, ECF No. 1.)

///

///

///

///

Plaintiff also claims that he was retaliated against for filing a grievance concerning Plaintiff's transfer from a skilled paid position to a lesser paid position.[2]  Plaintiff filed a grievance about the retaliation on February 1, 2007.  On February 5, 2007, Plaintiff appeared before the Institutional Classification Committee "for program review: having case referred to the DRB for placement in a Level III institution." (Compl. 11, ECF No. 1.)  The committee decided that Plaintiff should continue his present program until the DRB made a decision.  Plaintiff alleges that he was moved to another facility after the committee meeting, but was not told that he would be moved during the meeting.  Plaintiff lost his job because of the move to another facility.  On February 20, 2007, Plaintiff's grievance was partially granted at the informal level.  However, Plaintiff claimed he was still being retaliated against and appealed to the first level.  On March 27, 2007, Plaintiff alleges that Sergeant Sobbe reviewed Plaintiff's grievance and concluded that Plaintiff's allegations of retaliation were true.

On April 24, 2007[3], a committee elected to transfer Plaintiff to Centinela State Prison ("Centinela").  The committee included Defendants E. Henry and J. Flory.  The committee concluded that Plaintiff met the criteria for transfer.  Plaintiff claims that it was common knowledge that he was filing grievances and that he had recently prevailed on his retaliation grievance.  Plaintiff alleges that "Defendants took this opportunity to get rid of Plaintiff." (Compl. 23, ECF No. 1.)  Plaintiff argues that he demonstrated "good cause" as to why he should not be transferred, but he was nonetheless transferred in retaliation for filing grievances.

On December 16, 2008, the Court screened Plaintiff's complaint pursuant to 28 U.S.C. § 1915A. (Doc. #12.)  The Court found that Plaintiff's complaint stated cognizable claims against Defendants McGuinness and Patel Ismail for deliberate indifference toward Plaintiff's serious medical needs in violation of the Eighth Amendment.  The Court also found that Plaintiff's

---

[2]This action does not concern Plaintiff's allegations of retaliation with respect to Plaintiff's transfer from a skilled paid position to a lesser paid position.  Plaintiff does not identify which prison officials demoted Plaintiff and it is unclear when the demotion occurred.  Plaintiff's allegations focus on the retaliation the occurred after Plaintiff complained about the demotion.

[3]While Plaintiff's complaint alleges that the meeting occurred on April 24, 2007, Defendants' statement of undisputed facts states that the committee meeting occurred on April 25, 2007 and Plaintiff does not dispute this.

3

complaint stated cognizable claims against Defendants J. Gonzales, R. Fisher, R. Thomas, K. Reed, E. Henry, and J. Flory for retaliation against Plaintiff's First Amendment rights.  On February 27, 2009, all other claims in Plaintiff's complaint were dismissed for failure to state a claim.[4]  (Doc. #20.)

On August 12, 2009, the Court dismissed Defendants Gonzales and Reed pursuant to Federal Rule of Civil Procedure 4(m) because Plaintiff failed to serve them with a copy of his complaint and failed to provide the U.S. Marshal with sufficient information to effect service of process pursuant to Federal Rule of Civil Procedure 4(c)(3).  (Doc. #45.)  On September 29, 2010, the Court dismissed Plaintiff's claims against Defendant McGuinness because those claims were barred by the statute of limitations.

Accordingly, this action now proceeds on Plaintiff's claims against Defendant Patel Ismail for deliberate indifference toward Plaintiff's medical needs in violation of the Eighth Amendment and Plaintiff's claims against Defendants R. Fisher, R. Thomas, E. Henry, and J. Flory for retaliating against Plaintiff for exercising his protected First Amendment rights.

**B.**     **Defendants' Motion for Summary Judgment**

Defendants argue that there are no genuine issues as to any material facts and Defendants are entitled to judgement as a matter of law.  Defendants' motion is supported by a large number of documents attached as exhibits to their motion, such as inmate appeals, classification committee notes, medical records, responses to interrogatories, and memoranda.

**1.**     **Claims Against Defendant Patel**

Defendants argue that Defendant Patel was not deliberately indifferent toward Plaintiff's serious medical needs.  Plaintiff claims that he had a serious need for the medications Plavix and nitroglycerine.  Defendants contend that Patel did not know and did not have any reason to know that Plaintiff needed Plavix or nitroglycerine until Patel interviewed Plaintiff and immediately prescribed both medications.  Defendants contend that Plavix and nitroglycerine were prescribed to Plaintiff while he was incarcerated Corcoran State Prison, but were discontinued before Plaintiff was

---

[4]As a result of this order, Defendants Nurse John Doe, L. Garcia, Gricewich, Sobbe, Youssef, Jeanne Woodford, and N. Grannis were dismissed from this action.

transferred to KVSP. Defendant Patel assumed responsibility for prescribing Plaintiff's medications in November 2005. Patel continued to renew the medications prescribed by McGuinness until October 2006. Plaintiff was interviewed by Patel on October 11, 2006, and was prescribed Plavix and nitroglycerine after Plaintiff requested the medications.

Defendants also argue that Plaintiff's claims that Patel acted with deliberate indifference for failing to check up on Plaintiff have no merit because Patel did not know of any serious medical needs and Patel is not constitutionally obligated to check up on Plaintiff on a regular basis.

### 2.    **Claims Against Defendants Fisher and Thomas**

Defendants argue that Defendants Fisher and Thomas did not retaliate against Plaintiff for filing grievances by transferring Plaintiff to another facility. Defendants contend that Plaintiff has no evidence in support of his retaliation claim other than false assumptions based on coincidence. Plaintiff claims that Defendants Fisher and Thomas transferred Plaintiff to another facility; Fisher and Thomas contend, however, that they had no involvement with Plaintiff's transfer. Fisher and Thomas were members of a classification committee that met with Plaintiff on February 5, 2007 to determine whether Plaintiff should be referred to the DRB for a custody reduction and transfer to a lower custody prison. The same day, Plaintiff was transferred from B-Facility to D-Facility, but Defendants contend that the transfer was unrelated and the movement authorization was not signed by Fisher or Thomas.

Defendants contest Plaintiff's allegation that Sergeant Sobbe concluded that Plaintiff had been retaliated against. Defendants argue that Plaintiff misinterpreted the findings because Sobbe merely found that Plaintiff's transfer was adverse because Plaintiff lost his job.

### 3.    **Claims Against Defendants Flory and Henry**

Defendants argue that Defendants Flory and Henry did not retaliate against Plaintiff by transferring him to Centinela State Prison. Defendants contend that Flory and Henry were following a memorandum issued by the Deputy Director of the Division of Adult Institutions stating that Centinela was being converted into a Level IV Facility and KVSP was responsible for transferring 103 prisoners to Centinela. Flory and Henry were members of a committee screening inmates for transfer to Centinela. Plaintiff was interviewed by the committee on April 25, 2007. Plaintiff told

the committee that a transfer would interfere with his family visits and that the heat at Centinela would be too much for him.  The committee nonetheless determined that Plaintiff was suitable for transfer.

Defendants contend that Flory and Henry did not have ultimate authority to order Plaintiff's transfer; they merely referred Plaintiff to a Classification Staff Representative who made the final decision to transfer Plaintiff.  Further, Defendants contend that there is no evidence that Flory or Henry had any knowledge of Plaintiff's past grievances and their decisions were not motivated by anything other than the memorandum directing the prison to identify inmates eligible for transfer.

**C.    Plaintiff's Opposition**

Plaintiff filed a "Notice of Motion and Motion Establishing Genuine Issue of Material Facts, Pursuant to Rule 56" on September 20, 2010.  (Doc. #101.)  The motion appears to be Plaintiff's opposition to Defendants' motion for summary judgment and will hereinafter be referred to as Plaintiff's opposition.  Plaintiff filed his opposition along with declarations from himself and other inmates, and a large number of documents, such as inmate appeals, regulations, and what appear to be written questions answered by another doctor.

Plaintiff argues that there is a genuine issue of material fact as to whether Plaintiff's Plavix and nitroglycerin prescription was discontinued at Corcoran or at KVSP.  Plaintiff contends that he received Plavix and nitroglycerin the entire time he was at Corcoran and someone at KVSP discontinued those medications.  Plaintiff confusingly contends that Defendants' evidence does not prove that the medications were discontinued before Plaintiff arrived at KVSP because "one could simply make the argument doctors forgot or that when they order the medications; the due date on the Plavix and Nitroglycerin was not up yet."  Plaintiff contends that Defendant Patel was at all times in possession of Plaintiff's medical history and should have known  about Plaintiff's medical needs.

Plaintiff confusingly argues that "there are genuine issues of material facts exist where Dr. McGuinness and Dr. Patel, used the institutional MAR to determine what prescription plaintiff should receive."  (Notice of Mot. and Mot. Establishing Genuine Issue of Material Facts.  Pursuant to Rule 56 10, ECF No. 101.)  It is unclear what "MAR" is or what Defendant Patel did with it.  Plaintiff contends that "the MAR is only used for the continuing of prescribed Medication until the

inmate can be seen by a (PCP) at the new institution, whereby the inmate then will get a complete physical examination.  Thus, not one's[sic] have either doctor through their reply to complain; interrogatory and/or admission have said what plaintiff was being prescribed from the MAR was adequate treatment for a heart patient." (Mot. Establishing Genuine Issue of Material Facts 10, ECF No. 101.)  Plaintiff appears to argue that, regardless of what the records stated about Plaintiff's prescriptions, Patel should have performed an independent examination of Plaintiff and determined that Plaintiff should be receiving Plavix and nitroglycerine.

Plaintiff also argues that he gave Defendants notice of his medical needs, though Plaintiff's opposition does not recount any specific instances where he provided Defendants notice, or what kind of notice Plaintiff provided.  Plaintiff simply concludes that "the records reflect's[sic] 'he gave notice more than one's[sic].'" (Mot. Establishing Genuine Issue of Material Facts 11, ECF No. 101.)  Plaintiff told other doctors about "other possible unrelated illness about his need for medications" but complains that the other doctors "tend to not get involved with ongoing cases being treated by another doctor." (Mot. Establishing Genuine Issue of Material Facts 11, ECF No. 101.)

Plaintiff's arguments with respect to his retaliation claims against Defendants Fisher and Thomas focus on whether Defendants are entitled to qualified immunity, despite the fact that Defendants did not raise a qualified immunity defense in their motion for summary judgment. Plaintiff "emphatically dispute[s]" Defendants' claim that they had nothing to do with Plaintiff's transfer to a different facility and did not make the ultimate decision to transfer Plaintiff to Centinela. (Mot. Establishing Genuine Issue of Material Facts 14, ECF No. 101.)  Plaintiff does little to demonstrate how the facts are in dispute, other than "ask[ing] the court to review the records and find that genuine issues of material facts do exist." (Mot. Establishing Genuine Issue of Material Facts 14, ECF No. 101.)

Plaintiff contends that it is "unreasonable to suggest as Captain [Fisher] and in charge of managing day to day operations on Facility-B, had no knowledge" that "roughly 45 to 50 inmates would be moved to other cells." (Mot. Establishing Genuine Issue of Material Facts 15, ECF No. 101.)  Plaintiff also argues that regulations require Plaintiff to receive a classification committee hearing before he is transferred to another facility or institution.  Plaintiff contends the regulations

were not followed.  Plaintiff contends that:

> the omission of notifying plaintiff was retaliatory in nature because classification committee did in fact know of this large number of inmates going to be moved around.  When you look to the fact neither Defendant has claimed he did not know about the moves taking place; then one would have to 'ask' Plaintiff having a life without the possibility of parole sentence, and move him at 9:30 pm.  I'm sure plenty of those inmates pose less risk than Plaintiff that was kept on that yard.

(Mot. Establishing Genuine Issue of Material Facts 15-16, ECF No. 101.)  Plaintiff argues that the timing and nature of the incidents infer there was some retaliatory motive behind Plaintiff's transfers.

Plaintiff also argues that Defendants Flory and Henry are not entitled to qualified immunity despite the fact that neither Defendant raised qualified immunity as a defense in their motion for summary judgment.  Plaintiff contends that "Flory and Henry knew how important it was for him to remain close to family and the extreme heat would cause him problems, with the fact he was being seen for his heart pains or chest pains.  Plaintiff made that much clear." (Mot. Establishing Genuine Issue of Material Facts 17-18, ECF No. 101.)  Plaintiff argues that it should have been easy for the Defendants to find other inmates to transfer to Centinela because "most of [the inmates] would have loved the opportunity to go back to less restrictive prison, not to mention you had more inmates on A-facility that also fit the criteria." (Mot. Establishing Genuine Issue of Material Facts 19, ECF No. 101.)  Plaintiff argues that Defendants' failure to recommend the other inmates for transfer suggests that Plaintiff was singled out because he filed grievances.

### D.    Defendants' Reply

Defendants argue that Patel is entitled to summary judgment because Plaintiff has at most shown that Patel should have known or must have known about Plaintiff's needs for Plavix and nitroglycerine because Patel had access to Plaintiff's medical records.  Defendants argue that even if Patel had looked at Plaintiff's medical records, he would have only known that Plaintiff had received an angioplasty in the past.  Nothing in the records would have indicated that Plaintiff needed medical treatment beyond what he was already receiving.

Defendants further argue that Fisher and Thomas' failure to inform Plaintiff about his impending transfer cannot be considered an adverse action within the meaning of a retaliation claim.

Defendants also argue that Plaintiff has failed to present any evidence of retaliatory intent, other than assumptions and conclusions. Defendants further note that Thomas twice acted on Plaintiff's behalf, first by granting Plaintiff's appeal requesting referral to the DRB and then by actually making the referral. Defendants argue that any inference of retaliatory intent is unwarranted in light of those actions.

Finally, Defendants argue that Flory and Henry are entitled to summary judgment because they merely identified a group of prisoners who met the established criteria for transfer to Centinela and did not decide who actually got transferred. Defendants also argue that CDCR is not obligated to solicit volunteers for transfer merely because Plaintiff did not want to be transferred.

**E.    Plaintiff's "Second Reply"**

On November 12, 2010, Plaintiff filed a "Second Reply to Defendants[sic] Motion for Summary Judgment." (Doc. #108.) Plaintiff's "Second Reply" is improper. By Local Rule, a motion is fully briefed after the parties file a motion, an opposition, and a reply. Local Rule 230(a)-(d). In prisoner actions, "motions will be deemed submitted twenty-eight (28) days after the service of the motion or when the reply is filed, whichever comes first." Local Rule 230(l). The local rules do not provide for a "Second Reply," otherwise known as a surreply. Plaintiff has not requested leave to file a "Second Reply" or surreply. Accordingly, the Court will disregard Plaintiff's "Second Reply."

**II.    Undisputed Facts**

The following statement of undisputed facts is adopted from the statement provided by Defendants. (Doc. #91.) Plaintiff filed a response to Defendants' version of the undisputed facts. (Doc. #103.) Plaintiff appears to have reproduced Defendants' version of the undisputed facts and added annotations attempting to explain how Plaintiff disputes Defendants' version of the facts.

Where Plaintiff has clearly raised arguments disputing the paragraph in question, the Court has replaced that paragraph with "[DISPUTED]" in order to maintain the same paragraph numbering used by Defendants. Where Plaintiff has only disputed part of the paragraph, the Court has reproduced the undisputed facts with a footnote noting the facts in Defendants' version that are disputed. Where Plaintiff has attempted to dispute the paragraph in question, but the Court is unable

to comprehend Plaintiff's arguments, the Court has reproduced the paragraph with a footnote summarizing Plaintiff's response.

The following facts are treated as undisputed for the purposes of ruling on Defendants' motion for summary judgment:

1.    Plaintiff Claudell Earl Martin is serving a sentence of life without possibility of parole.

2.    On April 3, 2003, Plaintiff was transferred to Corcoran State Prison.  On July 27, 2005, Plaintiff was transferred to KVSP.[5]

3.    While Plaintiff was incarcerated at Corcoran State Prison, he underwent an angioplasty, and a stint was implanted.

4.    Following the surgery, Plaintiff was prescribed aspirin, Plavix, Lopressor, Zocor, aspirin, and nitroglycerine.[6]

5.    [DISPUTED]

6.    For the month of March 2005, while Plaintiff was still at Corcoran State Prison, Dr. Posner prescribed Lovastatin, aspirin, metoprolol, Hydrochlorothiazide, and nitroglycerine, but did not prescribe Plavix.  For the month of April 2005, while Plaintiff was still at Corcoran State Prison, Dr. Kim prescribed Hydrochlorothiazide,

///

///

///

---

[5]Defendants also contended that Plaintiff was transferred to Centinela State Prison on May 14, 2005, but Plaintiff "dispute being transferred to Centinela State Prison on May 14, 2005." (Response to Defendants[sic] Undisputed Material Facts Establishing Genuine Issues Exist, Pursuant to Rule 56(b) 3:6-8, ECF No. 103.) However, Plaintiff fails to explain why he disputes this fact and fails to cite to any evidence that conflicts with Defendants' version of the facts.

[6]Defendants also contended that the medications were prescribed on June 11, 2004, but Plaintiff "dispute Jun[sic] is the correct month." (Response to Defendants Undisputed Material Facts 3:20-22, ECF No. 103.) Plaintiff cites to "Plaintiff Complt Ex. A," but Exhibit A of Plaintiff's complaint is a document that is dated June 11, 2004 entitled "Discharge Instructi-[illegible]."  The document lists "ASA," "Plavix," "Lopressor," "Zocor," and "NTG" as prescribed medications.  Plaintiff's name is printed on the bottom-right-hand corner of the page.  Thus, it is unclear how Defendants' version of the facts is disputed.

Lovastatin, metoprolo, and aspirin, but did not prescribe either Plavix or nitroglycerine.[7]

7. Plaintiff was medically screened when he arrived at KVSP.

8. Plaintiff was seen by Dr. McGuinness on August 5, 2005, who issued orders for metoprolol, aspirin, Lovastatin, and Hydrochlorothiazide, a Lipid profile, a follow-up in three months, and a Hepatitis-A vaccination.[8]

9. On August 11, 2005, Plaintiff submitted an administrative appeal, contending that he had not yet received his medications. The appeal was granted at the informal level because Dr. McGuinness had ordered Plaintiff's medications and the KVSP pharmacy had agreed to dispense them.

10. Plaintiff attempted to proceed to the next level of appeal on September 5, 2005, contending that he had not received an explanation regarding why his medications were delayed for fourteen days.[9]

///

---

[7]Plaintiff disputes this paragraph, but it is unclear how or why the facts are in dispute. In his version of the undisputed facts, Plaintiff states: "Plaintiff dispute[sic] anything in these documents state[sic] to discontinue Plavix or Nitroglycerine. Both institution[sic] (KVSP) Delano, and Corcoran has[sic] the same system when they do discontinue any medication [see Attached Ex J; also Ex. B-000096]" (Response to Defendants Undisputed Material Facts 4:9-13, ECF No. 103.) It appears that Plaintiff disputes any contention that Plavix or nitroglycerine were discontinued, yet Plaintiff does not assert that Dr. Posner did prescribe Plavix in March 2005 or that Dr. Kim did prescribe Plavix or nitroglycerine in April 2005. Plaintiff refers to Exhibit J, which is an unauthenticated document titled "*** PATIENT PROFILE *** Includes All Prescriptions From 01/18/2005." (Decl. by Claudell Earl Martin Ex. J, ECF No. 99.) The document does indicate that nitroglycerin was prescribed by "Posner, Moss" from December 28, 2004 through March 28, 2005. The document does not list Plavix as a prescribed medication and does not dispute Defendants' version of the facts. Exhibit B-000096, referring to Defendants' motion for summary judgment exhibit, is a list of medications prescribed by Patel. The document does not dispute Defendants' version of the facts.

[8]Plaintiff "dispute[s that] those were the only medication[sic] being received while at Corcoran." (Response to Defendants Undisputed Material Facts 4:24-27, ECF No. 103.) However, Defendants did not assert that the listed medications were the only medications Plaintiff received while he was at Corcoran and the Court will treat the entire paragraph as undisputed.

[9]Plaintiff disputes this paragraph, but it is unclear how or why the facts are in dispute. Plaintiff states "Plaintiff dispute[sic] #10; Plaintiff resubmitted his 602 on September 5, 2005, because he had not received his medication [see complt. Ex. B, B1, B2] and after denial to resubmit[sic], Plaintiff 'asked as he still tried to be heard' would it have made a difference if he got his medication? That he had still been kept without his medication for over fourteen days." (Response to Defendants Undisputed Material Facts 5:12-18, ECF No. 103.) Plaintiff's response is incomprehensible.

11.   Appeals Examiner Gricewitch screened out Plaintiff's appeal on the ground that it had been granted.  Plaintiff responded to the screening order, stating that he had not received Plavix, and even if he had received all of his medications, a fourteen-day delay was unacceptable.

12.   KVSP has a pharmacy.  Plaintiff's prescriptions were dispensed from the KVSP pharmacy.  In response to Plaintiff's administrative appeal, he was informed that KVSP had difficulty in obtaining his medications from Corcoran, but that the KVSP pharmacy had agreed to dispense them ASAP.[10]

13.   On September 21, 2005, Plaintiff was medically evaluated because of his Hepatitis status.  This evaluation included a physical examination.  Additional medical tests were ordered.  Plaintiff did not mention that he wanted prescriptions for Plavix or nitroglycerine.  On October 19, 2005, Plaintiff refused to be examined at the Hepatitis Clinic.[11]

14.   Plaintiff could have requested medical services by submitting a request for interview form, an administrative appeal, or by asking medical staff at the time his medications were dispensed.[12]

///

[10]Plaintiff disputes this paragraph, but it is unclear how or why the facts are in dispute.  Plaintiff wrote: "Plaintiff dispute[sic] a pharmacy had been contracted to prescribe certain medications.  It is not reasonable to think they could have help plaintiff[sic] and just did not do it until a month after he was there."  (Response to Defendants Undisputed Material Facts 6:6-10, ECF No. 103.)

[11]Plaintiff responded to this paragraph by explaining that he refused to be examined because "medical knew since 1994 and did not tell Martin until 2004, when he had his heart surgery that he might have this illness.  Plaintiff was try[sic] to understand how could they do this?  Then he tired[sic] to explain his present situation not geting[sic] his medication.  He was informed only the doctor treating him for that condition could handle it.  So Plaintiff being feed-up[sic] with the treatment he was geting[sic]- told the doctor if something was wrong send him out to the hospital."  (Response to Defendants Undisputed Material Facts 6:19-28, ECF No. 103.)  Plaintiff's response fails to demonstrate how Defendants' version of the facts are in dispute; Plaintiff merely provides an explanation as to why he refused to be examined.

[12]Plaintiff responded to this paragraph by stating: "Plaintiff state the records reflect he did administrative grievances concerning his situation.  the[sic] law only require that he make an effort, and he clearly did.  Administration respond but continued an uncaring attitude, thus, the constitution protects Martin from this sort of delay in receiving his medication."  (Response to Defendants Undisputed Material Facts 7:6-13, ECF No. 103.)  It is unclear how Plaintiff's response disputes Defendants' version of the facts.  The Court does not construe Defendants' recitation of the facts as indicating whether or not Plaintiff actually requested medical treatment.

15.     Every prison in California is required to have an established "sick-call" system which provides scheduled times and locations for general population inmates to request medical services.[13]

16.     Dr. McGuinness continued Plaintiff's prescriptions through November 2005.  On November 15, 2005, Dr. Patel issued orders for Plaintiff's existing prescriptions to be continued.  Plaintiff's prescriptions remained the same until October 11, 2006, when Plavix and nitroglycerine were added.

17.     On August 1, 2006, at 6:30 a.m., Plaintiff complained to a correctional officer that he was choking on his food and needed immediate medical treatment.  The officer called the clinic and Medical Technical Assistant L. Garcia determined that it was not an emergency because the officer reported that Plaintiff was breathing and talking "just fine."  Plaintiff was personally assessed by MTA Garcia at 8:05 a.m., when she made rounds in the housing unit.

18.     Plaintiff submitted both a Health Care Services Request Form and an administrative appeal, contending that MTA Garcia had been unprofessional when she told him that medical staff would only treat him as an emergency if he were "blue in the face, and or on the floor unconscious."

19.     In response to Martin's administrative appeal, he was interviewed by Dr. Patel on October 11, 2006.  During that interview, Plaintiff requested prescriptions for nitroglycerine and Plavix, which were then prescribed by Dr. Patel.[14]

20.     [DISPUTED]

///

---

[13]Plaintiff responded to this paragraph by stating: "Plaintiff say what happin[sic] as in this case, medical staff was notified and simply did not do their job."  (Response to Defendants Undisputed Material Facts 7:18-20, ECF No. 103.)  It is unclear why Plaintiff wrote this or how the facts in this paragraph are in dispute.

[14]Plaintiff disputes this paragraph, but it is unclear how or why the facts are in dispute.  Plaintiff states: "Plaintiff dispute[sic] and assert[sic] the administrative grievance was not just against MTA Garcia, but also for the denial prescribed medications Plavix and nitroglycerine for the past year [see Def's Ex. A 6-12] Thus Dr. Patel was not doing Plaintiff a favor; but in fact was prescribing what he now seen in the records.  What should have always been apart[sic] of the prescribing."  (Response to Defendants Undisputed Material Facts 8:25-9:3, ECF No. 103.)

21.   Because Plaintiff is serving a term of life in prison without the possibility of parole, he is required to be incarcerated in a Level IV facility, unless the DRB approves a transfer to a Level III facility.

22.   At his annual classification review, on April 4, 2006, Plaintiff expressed interest in being referred to the DRB for transfer to a Level III facility.

23.   At Plaintiff's annual review on January 31, 2007, the United Classification Committee (UCC) referred him to the Institutional Classification Committee (ICC) for consideration of a referral to the DRB for transfer to a Level III facility.

24.   [DISPUTED]

25.   At approximately 2130 hours on February 5, 2007, Plaintiff and his cell partner were moved from Facility B, Building 2, cell 110, to Facility D, Building 7, cell 226.  The stated reason for the move was: "institutional needs."  The authorization was signed by someone other than Defendants Fisher or Thomas.[15]

26.   On February 1, 2007, Plaintiff submitted an administrative appeal, contending that he had unfairly been removed from a job assignment and given a job with a lower pay rate.

27.   [DISPUTED]

28.   After Plaintiff transferred to D-Facility, he was unassigned from his job and could not be put on a waiting list for a new job until he was seen by a classification committee.

29.   Because Plaintiff had a job assignment at the time he was moved to D-Facility, he had third priority for a new job assignment.

30.   [DISPUTED]

---

[15]Plaintiff disputes this paragraph but it is unclear how or why the facts are disputed.  Plaintiff states: "Plaintiff and cell4y[sic] were moved to another facility on February 5, 2007, the move to another facility on February 5, 2007.  The move was illegal [see Def's Ex. E-0000207].  Thomas states: institutional policies require the approval of a staff member at the rank of lieutenant or above, for any inmate's cell or bed move.  There is clearly no indication nothing else could have been done."  (Response to Defendants Undisputed Material Facts 10:21-28, ECF No. 103.)

31.   On March 30, 2007, the Deputy Director of the Division of Adult Institutions, announced that one of the Facilities at Centinela State Prison was being converted from a Level III Facility to Level IV, and institutions housing Level IV inmates were tasked with identifying Level IV inmates that met the criteria for housing in 270° design buildings.

32.   KVSP was tasked with identifying 103 Level IV inmates that could be transferred to Centinela.

33.   The Department of Corrections and Rehabilitation has two different architectural designs for Level IV facilities, known as 270° and 180° designs.  This design difference can be seen in Defendants' Exhibit G, which are photographs of KVSP, which has the 180° design buildings and Centinela, which has the 270° design buildings.

34.   Plaintiff was seen by a classification committee on April 25, 2007, to determine if he met the criteria for transfer to Centinela.  Defendants Henry and Flory were members of the committee.  They determined that Plaintiff had met the criteria and Martin was referred to a Classification Staff Representative for possible transfer to Centinela.

35.   Plaintiff informed the committee that he had been receiving visits from his family and believed that they would be subject to a hardship if he were moved to Centinela, and that he believed that the extreme temperatures would be too much for him because of his 2004 heart surgery.  Plaintiff's comments were noted by the committee.

36.   Any inmate transfer to a different prison, except a transfer from a Reception Center, requires a classification hearing and the approval of a Classification Staff Representative, therefore, Defendants Henry and Flory did not have the power to transfer Martin to Centinela.[16]

---

[16]Plaintiff disputes this paragraph, but it is unclear how or why the facts are disputed.  Plaintiff states: "Plaintiff dispute[sic] because the argument is in conflict with Defendants[sic] own argument in #24-25."  (Response to Defendants Undisputed Material Facts 13:23-24, ECF No. 103.)  Assuming Plaintiff is referring to #24-25 in Defendants' statement of undisputed facts, those paragraphs do not contain any statements that conflict with this

### III.    Summary Judgment Legal Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.   "A moving party without the ultimate burden of persuasion at trial-usually, but not always, a defendant-has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Federal Rule of Civil Procedure 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors

---

paragraph.

Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Federal Rule of Civil Procedure 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

**IV.   Discussion**

**A.   Defendant Patel is Entitled to Summary Judgment**

Defendants argue that Defendant Patel is entitled to summary judgment because Plaintiff has failed to submit sufficient evidence to establish a genuine issue of material fact as to whether Defendant Patel knew of any serious risk of substantial harm to Plaintiff. Plaintiff contends that

1   Patel was aware of a serious risk of harm because Patel was aware that Plaintiff was not receiving

2   Plavix or nitroglycerine.  Plaintiff also contends that Patel was aware of a serious risk of harm

3   because he failed to check up on Plaintiff for an entire year.

4        The Eighth Amendment prohibits the imposition of cruel and unusual punishments and

5   "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'"

6   Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir.

7   1968)).  A prison official violates the Eighth Amendment only when two requirements are met: (1)

8   the objective requirement that the deprivation is "sufficiently serious," and (2) the subjective

9   requirement that the prison official has a "sufficiently culpable state of mind."  Farmer v. Brennan,

10  511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

11       The objective requirement that the deprivation be "sufficiently serious" is met where the

12  prison official's act or omission results in the denial of "the minimal civilized measure of life's

13  necessities."  Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  The subjective

14  "sufficiently culpable state of mind" requirement is met when a prison official acts with "deliberate

15  indifference" to inmate health or safety.  Id. (quoting Wilson, 501 U.S. at 302-303).  A prison official

16  acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate

17  health or safety."  Id. at 837.  "[T]he official must both be aware of facts from which the inference

18  could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

19  Id.

20       "[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action

21  under § 1983."  Estelle, 429 U.S. at 105.  In order to state an Eighth Amendment claim based on

22  deficient medical treatment, a plaintiff must show: (1) a serious medical need, and (2) a deliberately

23  indifferent response by the defendant.  Conn v. City of Reno, 572 F.3d 1047, 1055 (9th Cir. 2009)

24  (quoting Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).  A serious medical need is shown by

25  alleging that the failure to treat the plaintiff's condition could result in further significant injury, or

26  the unnecessary and wanton infliction of pain.  Id.  A deliberately indifferent response by the

27  defendant is shown by a purposeful act or failure to respond to a prisoner's pain or possible medical

28  need and harm caused by the indifference.  Id.  In order to constitute deliberate indifference, there

must be an objective risk of harm and the defendant must have subjective awareness of that harm. Id.  However, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  Isolated occurrences of neglect do not constitute deliberate indifference to serious medical needs.  See Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992); O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990).

Plaintiff offers two contradictory theories for his claim against Defendant Patel.  First, Plaintiff suggests that Defendant Patel was aware that Plaintiff had a serious need for Plavix and nitroglycerine because Patel was in possession of Plaintiff's "prescribed plan of treatment." (Compl. 17, ECF No. 1.)  Plaintiff claims that "for whatever reason," Patel chose to abandon that treatment plan by failing to prescribe Plavix or nitroglycerine. (Compl. 17, ECF No. 1.)  Plaintiff alleges that Patel deliberately kept Plaintiff off of Plavix and nitroglycerine for a year, knowing that Plaintiff was at risk of serious further injury if he did not receive those medications.

Alternatively, Plaintiff claims that Defendant Patel was deliberately indifferent because he failed to "call Plaintiff in to check on him" for an entire year. (Compl. 17, ECF No. 1.)  Plaintiff alleges that "had [Patel] done so, he would have seen or Plaintiff could have told him he was not getting all his medication." (Compl. 17, ECF No. 1.)

The two theories contradict each other, as Plaintiff's first theory is only cognizable under the Eighth Amendment if Patel knew that Plaintiff needed Plavix and nitroglycerine and Plaintiff's second theory suggests that Patel did not know Plaintiff needed Plavix and that Patel's deliberate indifference action was his failure to check up on Plaintiff throughout the year.

Plaintiff's second theory is not cognizable.  Plaintiff attempts to hold Patel liable for failing to check up on Plaintiff.  This theory operates on the assumption that Patel was not aware of any specific threat to Plaintiff's health but would have become aware of a threat to Plaintiff's health had he checked up on Plaintiff earlier.  Such a theory may be sufficient to state a claim for negligence, but it does not rise to the level of deliberate indifference.

1    To rise to the level of deliberate indifference, Plaintiff would have to prove that Patel knew

2  of a serious risk to Plaintiff's health yet deliberately failed to check up on Plaintiff throughout the

3  year.  Plaintiff has not alleged any facts suggesting that the failure to take the initiative and check

4  on Plaintiff throughout the year was deliberately indifferent.  The Court notes that there is no

5  evidence that Patel knew or believed that Plaintiff was unable to request medical treatment on his

6  own.  It is unclear how Patel's failure to check up on Plaintiff rises to the level of deliberate

7  indifference if Patel believed that Plaintiff could have taken the initiative and requested Plavix and

8  nitroglycerine from Patel.

9    Patel prescribed Plavix and nitroglycerine on October 11, 2006, after Plaintiff requested the

10  medications.  Plaintiff claims Patel acted with deliberate indifference because Patel could have

11  checked on Plaintiff earlier and learned about Plaintiff's need for Plavix and nitroglycerine, but has

12  presented no evidence that Patel was aware of any serious risk to Plaintiff's health from the failure

13  to prescribe the medications before Plaintiff requested them.  Plaintiff refers to a document dated

14  August 5, 2005, that states Plaintiff's next medical visit should occur within 90 days.  However, the

15  document fails to indicate that the next visit was anything other than routine or that Plaintiff would

16  be at risk of serious harm if the next visit did not occur.  Additionally, the document does not

17  reference Plaintiff's need for Plavix or nitroglycerine.

18    Plaintiff's first theory turns on the question of whether Defendant Patel was aware that

19  Plaintiff needed Plavix and nitroglycerine and deliberately ignored the threats to Plaintiff's health

20  by failing to prescribe it.  Defendants contend that there is no evidence to suggest that Patel was

21  aware of Plaintiff's need for Plavix or nitroglycerine until he responded to Plaintiff's grievance on

22  October 11, 2006, and reinstated both medications.  The fact that Patel reinstated both medications

23  suggests that Patel did not act with deliberate indifference; Plaintiff fails to explain why Patel would

24  deliberately ignore the risk to Plaintiff's health before October 11, 2006, only to suddenly change

25  his mind and prescribe the medications on October 11, 2006.

26    Plaintiff contends that there is enough evidence to support the inference that Patel was aware

27  that Plaintiff needed Plavix and nitroglycerine because Patel was allegedly in possession of

28  Plaintiff's treatment plan.  However, Plaintiff has failed to submit any evidence suggesting the

existence of any treatment plan that would have made Patel aware of Plaintiff's need for Plavix and nitroglycerine. Paragraph 20 of Defendants' statement of undisputed facts contends that during the time Plaintiff alleges that he should have received Plavix and nitroglycerine, his medical records show no request for either medication and no complaint that he was experiencing chest pain. Plaintiff disputes this, citing to his own declaration, as well as "Ex. K."

Plaintiff's declaration cryptically states that "he gave doctors at the hepatitis clinic the information about his medication." Plaintiff does not identify with which doctors he spoke and fails to set forth what "information about his medication" he provided to those doctors. Plaintiff also contends that "he put in grievances on the issue," but fails to state whether or not Patel received or responded to any of those grievances and does not identify what he wrote in those grievances.

"Ex. K" presumably refers to a declaration from Plaintiff's cell mate, Gregory Thompson, marked as Exhibit K, filed separately from Plaintiff's opposition. Thompson declares that he saw Plaintiff rubbing his chest in pain and that Plaintiff always had nitroglycerine while he was at Corcoran. Thompson also states that he overheard Plaintiff talking to a registered nurse about his medications when they both arrived at KVSP. However, Thompson's declaration does not explain how Patel would have been aware of Plaintiff's need for Plavix or nitroglycerine.

The Court finds that Plaintiff's sparse evidence is not sufficient to create a genuine issue of material fact as to whether Patel was aware that Plaintiff had a serious need for Plavix or nitroglycerine. Plaintiff's evidence fails to show that Patel became aware of Plaintiff's need for Plavix or nitroglycerine before Plaintiff requested that Patel prescribe the medications. Plaintiff's declaration fails to offer any concrete assertion that Plaintiff personally told Patel about Plaintiff's need for Plavix and nitroglycerine. Plaintiff's allegations in his complaint suggest that at the time Plaintiff filed his complaint, Plaintiff did not know whether Patel was aware of Plaintiff's need for those medications during the year Plaintiff did not receive them.

Plaintiff has not identified any specific medical report that would have put Patel on notice that Plaintiff needed Plavix or nitroglycerine. It is unclear why Patel would have spontaneously read through Plaintiff's medical file to find such a document and Plaintiff has not set forth any persuasive arguments suggesting that Patel would be liable for failing to read through Plaintiff's medical file.

There is no suggestion that Patel read any of Plaintiff's grievances before he interviewed Plaintiff on October 11, 2006.  Moreover, Plaintiff has not identified any specific grievance that Patel could have read that would have placed him on notice of Plaintiff's need for Plavix or nitroglycerine before Plaintiff requested that Patel prescribe the medications.

In sum, there is no evidence that Patel knew about Plaintiff's serious need for the medications and deliberately ignored it.  The Court will recommend that summary judgment be entered in Defendant Patel's favor.

### B.    Defendants Fisher and Thomas are Entitled to Summary Judgment

Defendants argue that Fisher and Thomas are entitled to summary judgment because Plaintiff has failed to submit sufficient evidence to establish a genuine issue as to whether Fisher or Thomas retaliated against Plaintiff.  Plaintiff contends that Fisher and Thomas transferred Plaintiff from Facility B to Facility D in retaliation against Plaintiff for filing grievances.  Plaintiff contends that the transfer was adverse because it caused Plaintiff to lose his job.

In the prison context, allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a Section 1983 claim.  Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).  "[A] viable claim of First Amendment retaliation entails five basic elements:  (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under section 1983.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).

Defendants set forth two arguments in support of their position.  First, Defendants argue that they are entitled to summary judgment because Plaintiff is unable to establish a genuine issue of material fact as to whether Defendants took any adverse action against Plaintiff.  In other words, Defendants contend that Plaintiff has no evidence that Fisher or Thomas transferred Plaintiff from Facility-B to Facility-D.  Second, Defendants argue that Plaintiff is unable to establish a genuine

1   issue of material fact as to whether Fisher or Thomas acted with retaliatory intent.

2   ///

3          Plaintiff claims that the timing of his administrative grievance, his appearance before Fisher

4   and Thomas in a committee hearing, and his transfer are circumstantial evidence that Fisher and

5   Thomas transferred Plaintiff and that the transfer was retaliatory.   Plaintiff also contends that

6   Sergeant Sobbe concluded that Plaintiff had been retaliated against.

7          Plaintiff has submitted no evidence in support of his contention that Fisher and Thomas

8   transferred Plaintiff from Facility-B to Facility-D.   Defendants contend that another prison official

9   signed the form authorizing Plaintiff's transfer and Plaintiff has failed to submit any evidence to

10  rebut this.   Plaintiff argues that the timing of his appearance before Fisher and Thomas in a

11  committee hearing is circumstantial evidence that Fisher and Thomas transferred Plaintiff.   The

12  Court disagrees.   Plaintiff admits that the committee hearing had nothing to do with Plaintiff's

13  transfer from Facility B to Facility-D.   The committee hearing concerned Plaintiff's referral to the

14  DRB and not with any facility transfers.   There is nothing in the record to suggest that Fisher or

15  Thomas, as opposed to any other prison official at KVSP, arranged Plaintiff's transfer.

16         Further, Plaintiff has submitted insufficient evidence in support of his contention that Fisher

17  and Thomas acted with retaliatory intent.   Again, Plaintiff relies on the timing of the events as

18  sufficient evidence that Fisher and Thomas acted with retaliatory intent.   However, timing alone is

19  not sufficient evidence to persuade any reasonable fact-finder that Fisher and Thomas acted with

20  retaliatory intent.   See Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) (rejecting district court's

21  conclusion that defendants acted with retaliatory motive based on the timing of adverse action when

22  there was little else to support the inference of retaliatory motive); see also Davenport v. Board of

23  Trustees of State Center Community College District, 654 F. Supp. 2d 1073, 1101-1103 (E.D. Cal.

24  2009) (concluding, in employment discrimination context, that timing alone is insufficient

25  circumstantial evidence of improper pretext to withstand summary judgment); Wilson v. City of

26  Fountain Valley, 372 F. Supp. 2d 1178, 1191 (C.D. Cal. 2004) ("timing alone . . . will not suffice-

27  unless . . . it is 'unusually suggestive' of retaliatory motive-to defeat a motion for summary

28  judgment, once the defendants have submitted evidence that their adverse action against the plaintiff

was intended to serve legitimate non-retaliatory ends.").

Defendants vaguely contend that Plaintiff was transferred from Facility-B to Facility-D because of "institutional needs."  While such an explanation may not be sufficient to establish a connection to a legitimate, non-retaliatory goal, there is nothing in the record to suggest any retaliatory intent.  Plaintiff admits that he was transferred to another facility along with 45-50 other inmates.[17]  The fact that 50 inmates were transferred refutes any inference that Plaintiff was singled out for retaliatory purposes.  It is also unclear why Fisher or Thomas would retaliate against Plaintiff.  Plaintiff does not allege that Fisher or Thomas was adversely affected by Plaintiff's grievances in any significant way.  Plaintiff's medical grievances had nothing to do Fisher or Thomas.  Plaintiff's February 1, 2007 grievance complaining about his demotion from a skilled pay position to a lesser pay position does not appear to involve Fisher or Thomas.  The only grievances that directly involved Fisher or Thomas were Plaintiff's grievances requesting referral to the DRB.  Since Plaintiff's requests were granted, it is unclear why that would motivate Fisher or Thomas to retaliate against Plaintiff.

Plaintiff complains that he was transferred without any notice and nobody at the committee hearing told Plaintiff about the impending transfer.  However, the failure to notify Plaintiff about the pending transfer is not probative of whether Fisher and Thomas took adverse action against Plaintiff or whether they acted with retaliatory intent.  The failure to notify Plaintiff cannot be characterized as "adverse."  Even if Fisher and Thomas notified Plaintiff at the committee meeting about the transfer, there is no suggestion that the extra few hours' notice would have had any material effect on Plaintiff's transfer.

Plaintiff also argues that Sergeant Sobbe responded to one of Plaintiff's appeals and concluded that Plaintiff had been retaliated against.  Plaintiff has not attached the appeal in question

---

[17]In his opposition, Plaintiff argued that Fisher and Thomas must have known about Plaintiff's transfer from Facility-B to Facility-D: "Defendants Fisher and Thomas have never stated they did not know roughly 45 to 50 inmates would be moved to other cells.  In fact, it would be unreasonable to suggest as Captain [Fisher] and in charge of managing day to day operations on facility-B, had no knowledge of these cell-moves!"  (Mot. Establishing Genuine Issue of Material Facts 15:1-6, ECF No. 101.)  Later, Plaintiff wrote: ". . .classification committee did in fact know of this large number of inmates going to be moved around."  (Mot. Establishing Genuine Issue of Material Facts 15:21-16:2, ECF No. 101.)

to his opposition; however, the appeal is attached to Plaintiff's complaint. Sobbe's response states:

> IM Martin presented evidence in which it appeared that he was adversely affected. As a settlement, his 602 was granted. On 3/28/07 A program review was conducted & he was placed on the DYAG W/L. 3/28/07 he was given an assistance giver job.

(Compl. Ex. F, at 2, ECF No. 1.) Sobbe did not conclude that Plaintiff had been retaliated against, or that Fisher or Thomas retaliated against Plaintiff. The response does not mention Fisher or Thomas. Sobbe merely concluded that Plaintiff had been adversely effected, which is not in dispute because both sides acknowledge that Plaintiff lost his job.

The Court finds that Plaintiff has failed to submit sufficient evidence to support his allegation that Fisher and Thomas took adverse action against him or that Fisher and Thomas acted with retaliatory intent. Accordingly, the Court will recommend that summary judgment be granted in favor of Defendants Fisher and Thomas.

### C.   Defendants Henry and Flory are Entitled to Summary Judgment

Defendants argue that Henry and Flory are entitled to summary judgment because Plaintiff has failed to submit sufficient evidence to establish a genuine issue of fact as to whether Henry or Flory retaliated against Plaintiff. Plaintiff contends that Henry and Flory transferred Plaintiff to Centinela in retaliation against Plaintiff's grievances. Plaintiff contends that the transfer was adverse because it moved Plaintiff away from his family and because Plaintiff could not handle the hot temperatures at Centinela.

Defendants argue that they are entitled to summary judgment because Plaintiff has failed to submit sufficient evidence to establish a genuine issue of material fact as to whether Flory and Henry made the ultimate decision to transfer Plaintiff to Centinela and whether Flory and Henry acted with retaliatory intent. Defendants contend that Flory and Henry had no knowledge that Plaintiff had filed medical grievances and their actions were not motivated by anything other than a memorandum directing the prison to identify inmates eligible for transfer.

Whether Flory and Henry made the ultimate decision to transfer Plaintiff is not fatal to Plaintiff's claims because Plaintiff's placement on the list of prisoners eligible for transfer to Centinela could in itself be regarded as an adverse action against Plaintiff. However, Plaintiff's only

1  evidence of Flory and Henry's allegedly retaliatory motive is the timing of Plaintiff's grievances.

2  Plaintiff notes that a grievance concerning retaliation was granted by Sergeant Sobbe on March 27,

3  2007. On April 25, 2007, a committee (including Flory and Henry) decided that Plaintiff met the

4  criteria for transfer.

5       Defendants have identified a legitimate penological interest for the Centinela transfers in

6  support of their contention that Plaintiff's placement on the transfer list was not retaliatory.

7  Defendants allege that Centinela had recently been converted from a Level III prison to a Level IV

8  prison. Officials at KVSP were tasked with identifying 103 inmates to transfer to Centinela.

9  Plaintiff does not dispute these facts. Thus, it is apparent that the transfers served the legitimate

10 penological goal of reducing the number of inmates at KVSP and occupying the vacant prison space

11 at Centinela.

12      Other than the timing of the events, Plaintiff has not offered any evidence to corroborate his

13 allegation that his placement on the list of potential transfers was retaliatory. Neither party has

14 identified the relevant "criteria" for placement on the list. Defendants argue that Plaintiff met the

15 relevant criteria and Plaintiff has failed to submit anything to seriously challenge Defendants'

16 contention. Plaintiff claims that he should not have been placed on the list because a transfer would

17 have interfered with his family visits and he would not be able to handle the heat at Centinela. He

18 further argues that Defendants could have easily identified other inmates to transfer to Centinela.

19 However, Plaintiff has failed to identify any other prisoners who were not selected by Flory and

20 Henry for reasons similar to Plaintiff's. Had Plaintiff submitted evidence that other prisoners were

21 not eligible for transfer because of family concerns or heat sensitivity, Plaintiff's claim that his

22 selection was retaliatory would have more traction. Additionally, Plaintiff has not submitted any

23 evidence that the heat concerns were serious. Plaintiff has not submitted any reports from his

24 medical file indicating that Plaintiff's heart problems would be complicated by the temperatures at

25 Centinela. Plaintiff has not submitted any recommendations from any medical professionals

26 advising prison officials not to transfer Plaintiff to Centinela due to the heat.

27      Finally, the Court notes that there is scant evidence that Flory or Henry had any motive to

28 transfer Plaintiff from Centinela. Plaintiff alleges that it was well known that he filed grievances and

26

that Flory and Henry took advantage of an opportunity to get Plaintiff out of KVSP so Plaintiff could not file any more grievances. Plaintiff has not alleged that he filed any grievances against Flory or Henry and has not alleged that Flory or Henry suffered any adverse consequences from Plaintiff's grievances. Thus, Plaintiff's claim that Flory and Henry took adverse action against Plaintiff because of Plaintiff's grievances is tenuous at best.

In sum, Plaintiff has failed to submit sufficient evidence to support the inference that he would not have been found eligible for transfer to Centinela but for the exercise of his protected First Amendment rights. The timing of Plaintiff's selection is not sufficient to create a genuine issue of material fact. See discussion supra Part IV.B. Defendants have set forth a legitimate explanation for Plaintiff's placement on the list of inmates eligible for transfer to Centinela and Plaintiff has failed to submit sufficient evidence to rebut Defendants' showing. The Court will recommend that summary judgment be entered in favor of Defendants Flory and Henry.

**V.    Conclusion and Recommendation**

The Court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether Defendant Posner was aware of a serious risk to Plaintiff's health. The Court also finds that Plaintiff has failed to establish a genuine issue of material fact as to whether Defendants Fisher and Thomas took adverse action against Plaintiff or whether Fisher and Thomas acted with retaliatory intent. Finally, the Court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether Defendants Flory and Henry acted with retaliatory intent.

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment be GRANTED and judgment be entered in favor of Defendants.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with these Findings and Recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten (10) days after service of the objections. The parties are advised ///

that the failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **January 4, 2011**                        /s/ Sheila K. Oberto
                                                    UNITED STATES MAGISTRATE JUDGE